USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/30/2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: CHINA ORGANIC
SECURITIES LITIGATION

This Document Relates To: All Actions

11 Civ. 8623 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

    Plaintiff Jack Murrin brings this suit on behalf of a purported class of those who acquired stock in China Organic Agriculture, Inc. ("China Organic") between November 12, 2008, and May 17, 2011. During that period, China Organic stock, which traded on the so-called "over-the-counter" market, lost most of its value. But rather than sue China Organic, which is now a corporate shell with no assets, Murrin and the plaintiffs in a related action sued two of the company's former U.S. auditors: its former auditing firm, Morgenstern, Svoboda & Baer, CPA's, P.C. ("Morgenstern"); and one of that firm's former principals, David Svoboda ("Svoboda"). This Court previously consolidated the two actions and appointed Murrin as the lead plaintiff. (Docket No. 31). On July 6, 2012, Murrin filed his Consolidated Amended Class Action Complaint ("CAC" (Docket No. 34)), alleging (1) securities fraud against Morgenstern, pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (2) control-person liability against Svoboda, pursuant to Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t.

    Defendants now move to dismiss the CAC. For the reasons stated below, their motions are granted and the CAC is dismissed.

## BACKGROUND

    The following facts are taken from the CAC; documents referenced therein; and

1

documents of which the Court may take judicial notice, such as filings with the United States Securities and Exchange Commission ("SEC").  *See, e.g.*, *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474, 476 (2d Cir. 2006) (summary order) ("[J]udicial notice of [an SEC] filing [is] properly within the [district] court's discretion on a motion to dismiss.").  The allegations in the CAC are assumed to be true for purposes of these motions.  *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 135 (2d Cir. 2001).

**A.   China Organic and Its Auditors**

China Organic, a business with its principal place of operations in Dalian City, Laioning Province, People's Republic of China, sold various organic and health-oriented products in China.  (CAC ¶ 16).  Sometime prior to 2007, China Organic sought access to U.S. capital markets.  (CAC ¶¶ 2-3).  A common technique among Chinese companies for gaining such access without the burdens associated with traditional initial public offerings is to "reverse" merge with an existing publicly listed company in the United States.  (CAC ¶ 2).  On March 15, 2007, China Organic orchestrated such a merger between itself and Industrial Electric Services, Inc. ("IES"), a public company chartered in the United States; as a result of the merger, IES owned substantially all of the assets of China Organic, and China Organic's former shareholders held substantially all of the common stock of IES.  (*See* CAC ¶¶ 2-3).  To complete the process, in May 2007, IES formally changed its name to China Organic.  (CAC ¶ 5).

Shortly after the reverse merger, the new China Organic filed a Form 8-K with the SEC stating that it had hired Morgenstern as its auditor.  (CAC ¶¶ 3-4).  Morgenstern remained China Organic's auditor until June 30, 2009, when China Organic announced Morgenstern's resignation as its auditor.  China Organic, Current Report (8-K) (July 1, 2009), *available at* http://www.sec.gov/Archives/edgar/data/1337826/000119380509001375/0001193805-09-

001375.txt.  (*See* CAC ¶ 74).  At the same time that it announced Morgenstern's resignation, China Organic was careful to state, to avoid the appearance of irregularities, that the two Form 10-Ks Morgenstern had audited "did not contain an adverse opinion, a disclaimer of opinion or any qualifications or modifications related to uncertainty, limitation of audit scope or application of accounting principles" and that Morgenstern had expressed no disagreements "as to any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure and there have been no reportable events" with China Organic's accounting.  China Organic, Current Report (8-K) (July 1, 2009).  In a follow-up letter, Morgenstern wrote that it had read China Organic's Form 8-K and was "in agreement with [its] disclosures."  *Id.*

After Morgenstern's resignation as China Organic's auditor, one of Morgenstern's principals, Svoboda, was hired by Morgenstern's successor as China Organic's auditor, Acqavella, Chiarelli, Shuster, Berkower & Co., LLP ("ACSB").  (CAC ¶¶ 74-76).  Svoboda was the "engagement partner on the China Organic audit" with ACSB until June 3, 2010, when China Organic announced that ACSB, too, had resigned as its auditor.  (CAC ¶ 85).  As it had with Morgenstern, China Organic emphasized in its announcement of ACSB's resignation that the two firms had no disagreements "as to any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure."  (CAC ¶ 85).  On July 7, 2010, China Organic announced that Li & Company, PC, was China Organic's new auditor.  (CAC ¶ 86).  Thereafter, China Organic was unable to file an audited 10-Q or a 10-K.  (CAC ¶¶ 87-91).

B.  **The Material Misstatements**

Murrin alleges four categories of material misstatements made while Defendants served as China Organic's auditors: (1) statements about the sale of China Organic's subsidiary Jilin Songyuan City ErMaPao Green Rice Limited ("ErMaPao"); (2) statements about a debt China

Organic owed to Dalian Huiming ("Dalian"), a company China Organic had purchased; (3) statements expressing confidence in China Organic's internal controls and disclosure controls; and (4) statements claiming that Morgenstern had conducted its audits and reviews in compliance with relevant standards of the Public Company Accounting Oversight Board ("PCAOB") and Generally Accepted Accounting Standards ("GAAS") and that it believed China Organic's filings accurately represented the company's finances in accordance with Generally Accepted Accounting Principles ("GAAP").  These misstatements, and the disclosures that corrected them, were made in different reports and at different times, as described below.

1. **Statements About China Organic's Sale of ErMaPao**

On November 12, 2008, China Organic filed its 2008 third-quarter Form 10-Q.  *See* China Organic Agriculture, Inc., Quarterly Report (Form 10-Q) (Nov. 12, 2008), *available at* http://edgar.sec.gov/Archives/edgar/data/1337826/000119380508002983/0001193805-08-002983.txt.  (CAC ¶ 26).  According to the CAC, that report made three material misstatements regarding the sale of China Organic's principal operating subsidiary, ErMaPao, to Bothven Investments Limited ("Bothven") for $8.7 million.  (CAC ¶¶ 29, 31-33).  First, Murrin claims that the report fraudulently asserted that the sale to Bothven had already been completed even though China Organic revealed five months after the report's filing that, as of October 2008, it had received no payment from Bothven; instead, Bothven was to pay China Organic in installments throughout 2009.  (CAC ¶¶ 31-32, 38, 47).  Second, Murrin argues that the report was fraudulent because it did not account for those installment payments as receivables.  (CAC ¶ 32).  Third, Murrin claims that the report was fraudulent with regard to ErMaPao because it did not list ErMaPao's operations as discontinued.  (CAC ¶¶ 33).

China Organic filed its first amended 2008 third-quarter Form 10-Q on January 16, 2009.  (CAC ¶ 46).  At that time, it made no changes to the statements that Murrin alleges had been

4

fraudulent. (CAC ¶ 46). On April 27, 2009, however, China Organic filed a Form 10-K revealing that it had not, at that time, received any money from Bothven for the sale of ErMaPao. (CAC ¶ 47). Despite this admission, China Organic filed a second amended 2008 third-quarter Form 10-Q just two days later repeating the November 12, 2008 report's misstatements about its income from the sale of ErMaPao. (CAC ¶ 68).[1] In a December 3, 2009 letter to the Accounting Branch Chief at the SEC Division of Corporation Finance, China Organic explained that it had corrected its failure to indicate ErMaPao's discontinued operations in its April 29, 2009 filing, but did not file a form explaining those changes. (CAC ¶ 76).

### 2. Statements About China Organic's Debt to Dalian

China Organic's April 15, 2009 Form 10-K included a gain of $3,015,387 reflecting goodwill premised on the idea that debts it previously owed to Dalian had been forgiven.[2] In fact, however, the debt forgiveness occurred as one small part of a larger deal through which China Organic acquired sixty percent of the outstanding shares of Dalian. (CAC ¶¶ 48, 78). In China Organic's December 3, 2009 letter to the SEC's Accounting Branch Chief, the company stated that the $3,015,387 it had reported as cancellation-of-indebtedness income should instead have been reported as a purchase-price reduction because the debt had not been forgiven as a stand-alone transaction but rather as part the Dalian purchase. (CAC ¶ 76). China Organic Agriculture, Inc., Correspondence (Dec. 3, 2009), *available at* http://www.sec.gov/Archives/edgar/data/1337826/000143774909001953/filename1.htm. That same day, China Organic filed a Form 8-K stating that its 2008 third-quarter Form 10-Q could not be trusted because of its

---

[1]   Additionally, the second amended report included an unexplained increase in income by $1,240,691. (CAC ¶ 70). Murrin does not claim that this unexplained increase was fraudulent.

[2]   Although the Form 10-K is dated April 14, 2009, the CAC alleges that it was filed on April 15, 2009. For the sake of consistency, this Court adopts that date for purposes of this Opinion.

treatment of ErMaPao and that the financial statements in its Form 10-K and 2009 first-quarter Form 10-Q could not be relied upon because of their treatment of Dalian. (CAC ¶¶ 77-78).

On January 27, 2010, China Organic filed its first amended 2008 Form 10-K, explaining again that it was treating the funds attributable to the Dalian transaction as a decrease in purchase price rather than a gain. (CAC ¶ 80). The amended Form 10-K reflected a lower level of goodwill and "gain on debt conversion" (and therefore income); the difference between the gain listed in the two Form 10-Ks amounted to $3,015,387. *Compare* China Organic Agriculture, Inc., Annual Report (Form 10-K) F-2 to F-3 (Apr. 14, 2009), *available at* http://www.sec.gov/Archives/edgar/data/1337826/000119380509000793/0001193805-09-000793.txt, *with* China Organic Agriculture, Inc., Amended Annual Report (Form 10-K/A) F-1 to F-2 (Jan. 27, 2010), *available at* http://www.sec.gov/Archives/edgar/data/1337826/000143774910000130/chinaorganic_10ka1-123108.htm. On March 24, 2010, China Organic filed a first amended 2009 first-quarter Form 10-Q explaining that China Organic was restating earlier financial statements because it had previously but erroneously treated the $3,015,387 related to Dalian as a gain. (CAC ¶ 82).

3. **Statements Regarding China Organic's Internal Controls**

Third, Murrin claims that China Organic's 2008 third-quarter Form 10-Q, dated November 12, 2008, was fraudulent because it expressed confidence in the company's disclosure controls even though China Organic's Chief Executive Officer and Chief Financial Officer had concluded that those very disclosure controls were not effective. (CAC ¶¶ 30, 34-36). On January 27, 2010, China Organic filed a third amended 2008 third-quarter Form 10-Q disclosing that its disclosure controls had been ineffective since September 30, 2008. (CAC ¶ 79). China Organic blamed "the lack of experience of our management personnel in China with the rules and regulations of title [sic] Securities and Exchange Commission and, more generally, western

business procedures, and the failure of our personnel in China to timely communicate with the Company's representatives in the United States." (CAC ¶ 79 (quoting China Organic's third amended Form 10-Q)). These control problems led to delays and errors that caused the SEC to consider China Organic no longer to be current in its required Exchange Act reporting. (CAC ¶ 79). China Organic's failure to maintain timely Exchange Act reporting rendered it ineligible to register its securities via certain registration statements. (CAC ¶ 79).

### 4. Statements Regarding Compliance with Accounting Standards and Principles

Finally, Murrin attacks as fraudulent Morgenstern's unqualified audit and review reports in China Organic's SEC filings. The gist of these allegations is that, by providing an unqualified opinion supporting the statements in various SEC filings, Morgenstern was itself misrepresenting material information. For instance, the 2008 third-quarter Form 10-Q contained a November 4, 2008 report written by Morgenstern asserting that it had conducted a review in compliance with PCAOB standards and stating that the financial statements appeared to be "in conformity with" GAAP and are "fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived." (CAC ¶¶ 37-45). Murrin accuses Morgenstern of "kn[o]w[ing] or recklessly fail[ing] to know" that the ErMaPao sale should have been recorded differently and thereby charges Morgenstern with violations of Section 10(b) and Rule 10b-5. (CAC ¶ 45).

Similarly, on April 15, 2009, China Organic filed its 2008 Form 10-K, which contained an April 6, 2009 certification authored by Morgenstern. Murrin claims that the certification's "unqualified audit opinion" was materially false and misleading because Morgenstern did not conduct audits in accordance with PCAOB standards, GAAP, or GAAS. (CAC ¶¶ 49-67). Likewise, China Organic's 2009 first-quarter Form 10-Q (*see* CAC ¶ 71) included an unqualified review opinion — signed by Morgenstern — that Murrin claims was also misleading because of that opinion's noncompliance with PCAOB standards and GAAP. (CAC ¶¶ 72-73).

Murrin alleges that the inference of Morgenstern's knowledge with respect to the fraudulence of these statements is stronger than it might otherwise be because, as noted above, China Organic and Morgenstern jointly stated upon Morgenstern's resignation that there had been no disputes over accounting issues. (*See* CAC ¶ 74). Unlike the other three categories of statements, these statements were never corrected publicly, presumably because such a corrective disclosure would have been an admission by Morgenstern that it had violated the appropriate standards. In lieu of such a disclosure, Murrin points to the failure of any auditor after Svoboda to issue an audited Form 10-Q or Form 10-K for China Organic. (CAC ¶ 87).

## C. Procedural History

On November 29, 2011, Joseph M. Jason filed a putative class action in this District against China Organic, Morgenstern, and officers and directors of China Organic. (*See* Compl., 11 Civ. 8623, Docket No. 1). On January 24, 2012, Murrin filed a putative class action, also in this District, against China Organic and officers of China Organic. (*See* Compl., 12 Civ. 597, Docket No. 1). Following briefing by Jason and Murrin, the Honorable Leonard B. Sand — to whom this case was originally assigned — consolidated both actions and designated Murrin as the lead plaintiff of the putative class on April 4, 2012. (*See* Order, 11 Civ. 8623, Docket No. 31). Roughly three months later, Murrin filed the CAC. The CAC names only Morgenstern and Svoboda as defendants. All claims against China Organic itself were dropped.

## DISCUSSION

Morgenstern moves to dismiss, pursuant to Rule 12(b)(6), for three reasons. First, Morgenstern claims that Murrin fails to plead facts showing that Morgenstern's statements were subjectively and objectively false. (Morgenstern Mem. Law 9-16). Second, Morgenstern claims that Murrin fails to plead facts that give rise to a strong inference of scienter. (*Id.* at 16-18). Third, Morgenstern argues that Murrin fails to plead loss causation. (*Id.* at 18-22). Svoboda also

8

moves to dismiss, pursuant to Rules 12(b)(2), 12(b)(5), and 12(b)(6), on three grounds. First, he argues that the Court lacks personal jurisdiction over him because Murrin never obtained leave to amend the complaint to include him and never served him. (Svoboda Mem. Law 2-4). Second, he contends that the claims against him are time barred. (*Id.* at 4-6). Third, Svoboda avers that Murrin fails to state a claim against him because Murrin fails to sufficiently plead a primary violation (that is, that Morgenstern violated Section 10(b) or Rule 10b-5), that Svoboda controlled Morgenstern, or that Svoboda participated in the fraud. (*Id.* at 6-13).

As Svoboda's arguments are, at least in part, predicated on Morgenstern's arguments, the Court will address the adequacy of the CAC with respect to Morgenstern first.

### A. Applicable Legal Standards

To survive a Rule 12(b)(6) motion, a plaintiff must generally plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

Because he alleges securities fraud, Murrin must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that scienter — that is, a defendant's

9

"intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy Rule 9(b), a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)).

**B.  The CAC Fails To State a Claim Against Morgenstern for Securities Fraud**

The elements of claims under Section 10(b) and Rule 10b-5 are identical and well established. To state a claim that Morgenstern "made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5," Murrin must plausibly allege "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317-18, (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Murrin has failed to do so. In particular, his claims regarding the statements about ErMaPao and Dalian fail for lack of loss causation; he fails to allege scienter with respect to the claims about internal controls; and his claims about audit and financial statements standards fail to satisfy the requirements of Rule 9(b).

1. **Loss Causation**

First, Murrin has failed to plead facts showing loss causation for the statements about ErMaPao and Dalian. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (internal quotation marks omitted); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (defining loss causation as "a causal connection between the material misrepresentation and the loss"). A misstatement or omission "is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations [or omissions] alleged by a disappointed investor." *Lattanzio*, 476 F.3d at 157 (citations, internal quotation marks, and alterations omitted). The loss causation requirement "exists because private securities fraud actions are 'available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (quoting *Dura Pharm.*, 544 U.S. at 345).

In light of the foregoing principles, where there is a corrective disclosure, "a plaintiff must tie his loss to the dissipation of an inflated (or deflated) price upon a disclosing event that reveals the false information to the market." *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 751 (S.D.N.Y. 2011). "[A] particular disclosure constitutes a sufficient foundation for loss causation allegations only if it somehow reveals to the market that a defendant's prior statements were not entirely true or accurate." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008). Put together, a plaintiff must point to a statement that, because it corrected a prior falsehood, precipitated a change in the security's price causing his loss. Murrin has failed to do so with respect to the ErMaPao and Dalian statements.

11

To show loss causation, Murrin picks a local maximum on China Organic's stock chart — $1.33 per share on January 11, 2010 — and notes that the price went down after that date, especially following the disclosure that internal controls were flawed. (CAC ¶ 81; *see also* CAC ¶ 83 (describing a decrease in share price in March 2010, after China Organic again disclosed that it had mistreated the Dalian debt)). But while those dates and prices may give rise to an inference of loss causation with respect to the January 27, 2010 report announcing that China Organic's internal controls had failed and that it was out of compliance with the Exchange Act, they have no bearing on the ErMaPao or Dalian misstatements, which were corrected *before* January 11, 2010. In fact, as discussed below, share prices actually went *up* shortly after the corrective disclosures regarding ErMaPao and Dalian, and Murrin has alleged no facts that could otherwise show loss causation for those two transactions.

China Organic first disclosed that the full amount of the Dalian debt should have been treated as a purchase price reduction on December 3, 2009. (*See* CAC ¶ 76). *See also* China Organic Agriculture, Inc., Correspondence (Dec. 3, 2009) ("[T]he amount previously reported as gain from the forgiveness of the debt should be treated effectively as a reduction of the purchase price."); *id.* ("C will waive RMB 20,584,539 debt to Dalian Huiming . . . ." (quoting a translation of a letter)). That day, China Organic's stock opened at 72 cents per share and closed at 77 cents per share. *See China Organic Agriculture, Inc. (CNOA)*, Yahoo! Finance, http://finance.yahoo.com/q/hp?s=CNOA&a=10&b=1&c=2009&d=01&e=28&f=2010&g=d; *see also Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37 (2d Cir. 2012) ("[A court is] entitled to take judicial notice of well publicized stock prices without converting [a] motion to dismiss into one for summary judgment"). That is, "following the December 3, 2009 corrective statement filed on form 8-K with the SEC, China Organic's stock went up, not down." (Morgenstern

12

Mem. Law 19).  Moreover, although China Organic traded below its December 3, 2009 open price between December 4th and 15th, starting on December 16th, China Organic traded above its December 3rd open price until February 16, 2010.  *See China Organic Agriculture, Inc. (CNOA)*, Yahoo! Finance, http://finance.yahoo.com/q/hp?s=CNOA&a=11&b=3&c=2009&d=01&e=16&f=2010&g=d.

Where, as here, a "reduced share price was within the 'zone of risk' of the allegedly concealed information," but "no loss occurred upon the revelation of this information," a claim must be dismissed under Rule 12(b)(6) for failure to plead loss causation.  *GE Investors v. Gen. Elec. Co.*, 447 F. App'x 229, 232 (2d Cir. 2011) (summary order).  Although the Second Circuit recently held that an increase in share price shortly after the close of the class period only raises an issue of fact not resolvable at the motion-to-dismiss stage, *see Acticon*, 692 F.3d at 41, that case was premised on plaintiffs' having suffered an actual loss *during* the class period.  Here, Plaintiffs have failed to show any loss immediately following the December 3, 2009 corrective disclosure.

Murrin's reliance on a loss following China Organic's restatement of its financials to include the Dalian debt as a reduction of purchase price and other information does not show loss causation for the Dalian debt misstatement.  Importantly, plaintiffs cannot allege loss causation every time a firm restates an earlier corrective disclosure.  *See In re Omnicom Grp. Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) ("A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure."), *aff'd*, 597 F.3d 501, 513 (2d Cir. 2010) ("Because appellant failed to demonstrate any new information in the June 12 article regarding Omnicom's alleged fraud, appellant has failed to show a price decline due to a corrective disclosure."); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y.

2010) ("Loss causation may be adequately pleaded by alleging either a corrective disclosure of a *previously undisclosed* truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline." (emphasis added)).

For the same reasons, there can be no loss causation as to any statements regarding ErMaPao. China Organic revealed that it had not properly accounted for ErMaPao on Monday, April 27, 2009. (CAC ¶ 47). On Friday, April 24, 2009, shares of China Organic closed at 30 cents per share. *See China Organic Agriculture, Inc. (CNOA)*, Yahoo! Finance, http://finance.yahoo.com/q/hp?s=CNOA&a=03&b=24&c=2009&d=03&e=24&f=2009&g=d. On April 27th, China Organic opened and closed at 26 cents per share. *See China Organic Agriculture, Inc. (CNOA)*, Yahoo! Finance, http://finance.yahoo.com/q/hp?s=CNOA&a=03&b=27&c=2009&d=03&e=27&f=2009&g=d. Except for April 28th, 29th, and 30th, the daily closing price of China Organic's shares remained above 26 cents per share for more than a year after the disclosure of ErMaPao's price. *See China Organic Agriculture, Inc. (CNOA)*, Yahoo! Finance, http://finance.yahoo.com/q/hp?s=CNOA&a=03&b=1&c=2009&d=05&e=30&f=2010&g=d&z=66&y=0. Accordingly, Murrin's claims with respect to statements about ErMaPao and Dalian fail as a matter of law and must be dismissed.

### 2. Scienter

Although Murrin may have plausibly alleged loss causation with respect to the third set of statements — those expressing confidence in China Organic's internal controls and disclosure controls — the claims relating to those statements must be dismissed for a different reason: failure to allege scienter. Under the PSLRA, a plaintiff must plead and prove that, taking the facts as pleaded, a strong inference of fraudulent intent is warranted. *See, e.g.*, *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013). There are two ways to show such a strong inference: "by alleging facts '(1) showing that the defendants had both motive and opportunity to

commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 605 (S.D.N.Y. 2009) (quoting *ATSI Commc'ns*, 493 F.3d at 99).  Measured against these standards, Murrin's allegations with respect to the third category of alleged misstatements fall short.

      First, Murrin fails to allege that Morgenstern had the motive and opportunity to issue the false statements at issue because Murrin pleads Morgenstern's actual knowledge in only a conclusory manner.  (CAC ¶ 98-102).  Although it may be plausible that an auditor would go to great lengths to keep a client's business — even, in some circumstances, by deliberately misstating its finances — such an assumption, by itself, is insufficient to show motive.  *See, e.g.*, *Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182, 2005 WL 1799370, at *2 (S.D.N.Y. Aug. 1, 2005) ("[T]he current state of the case law holds . . . that no independent auditor would risk ruination of its reputation for the fees it would collect in order to suppress fraud."); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 471-72 (S.D.N.Y. 2004) ("Absent specific facts warranting a departure from the assumption that Deloitte was acting in its economic self-interest, [this Court] declines to infer fraudulent intent merely from its desire to keep a client."); *Duncan v. Pencer*, No. 94 Civ. 321 (LAP), 1996 WL 19043, at *9-11 (S.D.N.Y. Jan. 18, 1996) (declining to infer sufficient scienter based solely on the fact of an accountant-client relationship).

      Nor can Murrin show conscious misbehavior on the part of Morgenstern.  An allegation of conscious misbehavior requires very strong circumstantial allegations of deliberate illegal behavior, *see, e.g.*, *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d at 471-72, which Murrin fails to make.  In particular, although the CAC repeatedly asserts that Morgenstern knew critical facts (*see, e.g.*, CAC ¶¶ 45, 54, 61), it never specifies what those facts were.  That failure is fatal. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants

15

had access to contrary facts, they must specifically identify the reports or statements containing this information."); *cf. McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 128 (S.D.N.Y. 2013) ("[S]tanding alone, allegations that a defendant 'would have learned the truth' if it had performed sufficient due diligence have been repeatedly rejected as insufficient to allege knowledge or conscious recklessness.").

To survive dismissal, therefore, the CAC must plead a plausible claim of recklessness. This Court has long held that, when alleging reckless scienter by an auditor, "plaintiffs must allege that '[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.'" *McIntire*, 927 F. Supp. 2d at 130 (quoting *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007)); *accord S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). Such recklessness cannot be shown with GAAP or GAAS violations alone. *See Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 568 (S.D.N.Y. 2011) (describing "the well-settled law of this Circuit . . . that alleged GAAP or GAAS violations do not establish scienter of their own force"), *aff'd*, 462 F. App'x 618 (2d Cir. 2012) (summary order). Instead, "[a] complaint might reach [the] 'no audit at all' threshold by alleging that the auditor disregarded specific 'red flags' that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012) (quoting *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) (internal quotation marks omitted)); *see also Stephenson*, 768 F. Supp. 2d at 578-79 (citing examples of recklessness that strongly show circumstantial awareness of problems).

Murrin has not sufficiently pleaded that Morgenstern was reckless regarding its alleged misstatements concerning the failure to find and disclose flaws in China Organic's internal controls. As courts in the Second Circuit have held many times, "the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." *Novak*, 216 F.3d at 309; *see also, e.g.*, *Stephenson*, 482 F. App'x at 623; *Isakov v. Ernst & Young, Ltd.*, No. 3:10cv1517 (MRK), 2012 WL 951897, at *5 (D. Conn. Mar. 19, 2012) (Kravitz, J.). Therefore, Morgenstern cannot be held accountable for failing to investigate China Organic's internal controls as such, and Murrin's third category of claims must also be dismissed.

### 3. Rule 9(b) Particularity

Finally, Murrin's claims with respect to the fourth category of statements — concerning compliance with GAAP, GAAS, and PCAOB standards — fail to satisfy the heightened pleading requirements of Rule 9(b). A plaintiff's failure to plead with specificity why an accountant's statements were fraudulent is grounds for dismissal. *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 255-56 (S.D.N.Y. 2012); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204 (1st Cir. 1999) (holding that the "complete absence" of details describing a GAAP violation "is indicative of the excessive generality of these allegations"); *cf. Rombach*, 355 F.3d at 174 ("To succeed on this claim, plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.").

Here, other than the statements discussed and dismissed above, Murrin simply does not identify any specific aspect of China Organic's financial reports — or Morgenstern's audits of them — that was fraudulent. But that is exactly what is required by Rule 9(b). The decision in *Varghese*, cited by both Morgenstern and Murrin, is not to the contrary. Although the *Varghese*

17

Court cited to very general audit-standards allegations when it concluded that the plaintiffs in that case had "allege[d] specific GAAS violations," *see* 672 F. Supp. 2d at 609 (citing Amended Compl. ¶¶ 80-86), the plaintiffs in that case also alleged that "statements regarding [the firm's] net loss, losses per share, and general and administrative expenses were each false and misleading," *id.* at 606. No such supporting allegations are to be found here; beyond financial details relating to ErMaPao and Dalian that had no demonstrable negative effect on share price, Murrin pleads no such misstatements.[3]

To be sure, Murrin is in a bit of a bind. Rule 9(b) requires him to explain why he believes Morgenstern's statements were fraudulent, but, because China Organic stopped reporting audited financials, he has only limited means to find out whether and how the auditor materially violated relevant standards. Nevertheless, Rule 9(b) is no less the law for its stringency, and other plaintiffs without access to restatements have managed to plead accounting standards violations with the requisite degree of specificity. *See, e.g.*, *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78-81 (1st Cir. 2002) (alleging that financial statements were misleading because of undisclosed price protection and channel stuffing); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 889-93 (D. Minn. 2011) (alleging, among other things, channel stuffing and misleading consignment accounting); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1222-25 (N.D. Okla. 2003) (alleging, among other things, "improper IRU/swap transactions" and overstated asset values); *cf. Feiner v. SS&C Techs.*, 11 F. Supp. 2d 204, 208-09 (D. Conn. 1998) (alleging overstated revenues in a Prospectus because the firm declared revenues too early). Here, by contrast, Plaintiff merely pleads that the ErMaPao and Dalian

---

[3] Furthermore, as explained above, Murrin's claims relating to the ErMaPao and Dalian misstatements fail because he cannot show loss causation with respect to those statements. As a result, Murrin cannot rely on those statements to show that he pleaded fraud with respect to a *different* category of statements with particularity.

transactions were reported incorrectly and that the audit was generally an inaccurate report of China Organic's finances. That does not suffice to state a claim.

## C. The CAC Fails To State a Control Person Claim Against Svoboda

For the foregoing reasons, Murrin's securities fraud claims against Morgenstern fail. It follows that Murrin's "control person" claim against Svoboda also fails, as it is premised on Murrin having a valid securities fraud claim against Morgenstern. *See, e.g.*, *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 139 (2d Cir. 2011); *see also, e.g.*, *Solow v. Citigroup, Inc.*, No. 10 Civ. 2927 (RWS), 2012 WL 1813277, at *10 (S.D.N.Y. May 18, 2012) ("Because Plaintiff has failed to plead a primary violation of the securities laws, his control-person claim is also dismissed."); *Tyler v. Liz Claiborne, Inc.*, 814 F.Supp.2d 323, 344 (S.D.N.Y. 2011) (same). The Court need not, and does not, address Svoboda's other arguments for dismissal, relating to the statute of limitations and personal jurisdiction. *See, e.g.*, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013) ("Although we traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues. In cases involving multiple defendants — over some of whom the court indisputably has personal jurisdiction — in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, [a court may] proceed[] directly to the merits on a motion to dismiss . . . ." (citations and internal quotation marks omitted)).

## D. No Rule 11 Sanctions Are Warranted

Under the PSLRA, the Court is required to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). All legal claims and

defenses presented here were nonfrivolous under existing law. All factual contentions had evidentiary support or were reasonably based on belief or a lack of information. Accordingly, no sanctions under Rule 11 are warranted.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are GRANTED, and the CAC is dismissed in its entirety. The Clerk of Court is directed to terminate Docket Numbers 39 and 42 and to close the case.

SO ORDERED.

Dated: September 30, 2013
      New York, New York

_____
JESSE M. FURMAN
United States District Judge